2023 IL App (2d) 220031-U
Nos. 2-22-0031 & 2-22-0032 & 2-22-0033 cons.
Order filed February 24, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| RENEA AMEN, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | No. 21-OP-522 |
| | ) | |
| DEB ATTIAH | ) | |
| | ) | |
| Respondent-Appellee. | ) | Honorable |
| | ) | James K. Simonian, |
| | ) | Judge, Presiding. |

_____

| | | |
|---|---|---|
| RENEA AMEN, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | No. 21-OP-523 |
| | ) | |
| HEATHER RAND, | ) | |
| | ) | |
| Respondent-Appellee. | ) | Honorable |
| | ) | James K. Simonian, |
| | ) | Judge, Presiding. |

_____

| | | |
|---|---|---|
| RENEA AMEN, | ) | Appeal from the Circuit Court |
| | ) | of Lake County |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | No. 21-OP-524 |

|  |  |  |  |
|---|---|---|---|
|  | ) |  |  |
| SHARI GREEN | ) |  |  |
|  | ) |  |  |
| Respondent-Appellee. | ) | Honorable |  |
|  | ) | James K. Simonian, |  |
|  | ) | Judge, Presiding. |  |

JUSTICE HUTCHINSON delivered the judgment of the court.
Presiding Justice McLaren and Justice Jorgensen concurred in the judgment.

**ORDER**

¶ 1     *Held*: The trial court did not abuse its discretion in granting respondents' motion for sanctions pursuant to Rule 137 and awarding respondents attorney fees and costs.

¶ 2     Petitioner, Renea Amen, appeals from the trial court's orders (1) granting respondents' motions for Rule 137 sanctions; (2) denying her motion to reconsider the order granting Rule 137 sanctions; and (3) setting attorney fees and costs. For the reasons that follow, we affirm the trial court's orders.

¶ 3                                          I. BACKGROUND

¶ 4     On March 29, 2021, Amen filed verified petitions seeking stalking, no contact orders against Deb Attiah (21-OP-522), Heather Rand (21-OP-523), and Shari Green (21-OP-524) (collectively "respondents"). The petition against Attiah alleged, in its entirety, as follows:

"ON FRIDAY NIGHT 3-26-2021, I WAS CONTACTED REGARDING SOME

FACEBOOK POSTS THAT WERE POSTED IN A PARENT GROUP BY THE

RESPONDENT AND HER FRIENDS. THE POST WAS THEN PLACED IN THIS

PARENT GROUP THAT HAS TARGETED ME OVER THE LAST SEVERAL

MONTHS SINCE RUNNING FOR THE WOODLAND SCHOOL BOARD. THERE

WAS A RECORDED CONVERSATION OF THE RESPONDENT ALLEGEDLY THAT

WISHED HARM UPON ME, AS [']MY CLENTS HAD DONE TO OTHERS['], AND

THAT [']SHE WAS SO TIRED OF WHEN THESE PEOPLE GET A LITTLE BIT OF MONEY THEY THINK THEY CAN MAKE DECISIONS FOR US, WHY CANT SHE JUST STAY IN WAUKEGAN, ISN'T THAT THE TRASH SHE REPRESENTS.['] I LATER WROTE A FACEBOOK POST ASKING WHY THEY WERE SO CONCERNED WITH ME, IT WAS AT THAT TIME THAT DEB AND HER HUSBAND ALEX BECAME SO UNCIVIL THAT THE POST WAS TAKEN DOWN. THESE ATTACKS HAVE BEEN TARGETED AGAINST ME, NO ONE ELSE ON THE BOARD. THEY HAVE WRITTEN LETTERS TO MY OFFICE UNDER FALSE NAMES, AS WELL AS WHEN I HELD A QUESTION AND ANSWER SESSION, THE SAME TYPES OF COMMENTS WERE MADE. I BELIEVE THAT MY KIDS AND MYSELF ARE IN DANGER. I BANNED DEB FROM MY PAGE. SHE THEN WENT ONTO ANOTHER PAGE TO CONTACT ME. I ASKED HER TO STAY AWAY. SHE THEN EMAILED THE BOARD IN AN EFFORT TO MAKE CONTACT WITH ME.

SEVERAL WEEKS PRIOR, THE SCHOOL DISTRICT HAD TO MAKE A RESOLUTION DENOUNCING THE RACIAL ATTACKS THAT HAD BEEN DIRECTED AT ME. THAT WAS BECAUSE THIS PARTICULAR GROUP, INCLUDING DEB, HAS MADE OTHER THREATS TO ME. THOSE THREATS HAVE COME FROM FAKE FACEBOOK ACCOUNT THAT HAVE BEEN REMOVED BY FACEBOOK. THE THREATS INCLDUED [']WE DO NOT WANT YOUR KIND IN OUR COMMUNITY, FOCUS ON YOUR CAREER, YOU LIVE A PRIVILEGED LIFE AND SO DO YOUR KIDS. YOU THINK YOU ARE PRIVATE BY USING A WAUKEGAN ADDRESS BUT WE KNOW WHERE YOU LIVE.['] DUE TO THE NATURE OF MY JOB, I HAVE ALWAYS USED WAUKEGAN, MY BUSINESS,

AS MY ADDRESS. I HAVE ALSO PLACED MY HOME IN A TRUST. THERE IS NO WAY THAT THESE PEOPLE SHOULD HAVE BEEN ABLE TO FIND MY HOME ADDRESS. I HAVE CONTACTED THE SHERIFF'S OFFICE AND THEY HAVE STARTED EXTRA PATROLS OVER THE PAST FEW WEEKS. THESE ATTACKS HAVE BEEN TARGETED AGAINST ONLY ME, NO ONE ELSE ON THE BOARD."

The petitions against Rand and Green made identical allegations and were largely duplicative of the petition against Attiah, with the following additions:

"HEATHER WENT ONTO MY PAGE AND MADE SOME ACCUSATIONS AS WELL AS OTHER PAGES. WHEN THE WOODLAND FEDERATION OF TEACHERS ENDORSED ME, SHE PERSONALLY WENT ONTO THEIR PAGES AND OTHER PAGES MAKING STATEMENTS ABOUT ME AND ALSO HIDING BEHIND THIS PRIVATE GROUP. SHE HAS BEEN GOING ONTO MY PRIVATE PAGE AND TAKING SCREENSHOTS AND IS ALSO ADDING IT TO THE GROUP WHERE THE THREATS ARE ORIGINATING. EITHER SHE IS MAKING THE THREATS HERSELF OR SHE IS AT THE VERY LEAST CUPLABLE BECAUSE SHE IS GIVING THEM INFORMATION ALONG WITH SHARI GREEN. I WOULD LIKE ALL OF THESE LADIES TO STAY AWAY. WHEN I INITIALLY FOUND OUT, SHARI GOT MY PHONE NUMBER AND CALLED ME EVEN THOUGH I REQUESTED NO CONTACT."

¶ 5 An emergency hearing was held on all three petitions on March 29, 2021. Amen appeared *pro se*. The trial court found no immediate and present danger of abuse and denied Amen's request for emergency relief. The matters were set for a plenary hearing on April 21, 2021. In all its orders the trial court noted as follows:

- 4 -

"[Amen] is a Gurnee School Board Candidate and [Attiah] may be a rival or otherwise opposed to [Amen]; [Amen] indicated that [Attiah] and [Rand and Green] have held a protest against [Amen] *** and posted statements on [Facebook] indicating [Amen] will pay for her decisions on the board, that [Amen] thinks she's safe; disapproval of [Amen's] [Facebook] marketing of her firm; that she should stay in Waukegan, etc."

¶ 6 On April 21, 2021, Amen appeared for the plenary hearing on the three petitions while represented by counsel, LaTonya Burton. Respondents also appeared with counsel. The trial court issued the following order in all three cases:

"Case called at 1:45p.m. for plenary hearing; the original emergency request was denied; [attorney] Burton granted leave to file her appearance and requested a continuance to subpoena social media documents; [attorneys on behalf of respondents] objected to the continuance and to only setting this matter down for status for the next date; not for hearing but for status only."

¶ 7 On May 26, 2021, the trial court issued the following order in the matters, continuing for further hearing on July 8, 2021:

"Case up for status of subpoenaed material; *** Per Burton, Facebook responded with an email refusing to comply [with] subpoena indicating the court did not have jurisdiction; *** Burton granted leave to submit proposed order requiring Facebook to comply."

¶ 8 On June 1, 2021, Attiah filed a motion to quash subpoena, alleging that Amen issued an overly broad subpoena for posts on the Woodland D50 for In-Person Schooling Facebook page. Also on June 1, 2021, Attiah filed a motion to strike the stalking no contact petition for Amen's failure to respond to Attiah's April 26, 2021, notice for a bill of particulars. The motion stated that

"Because the pleading in this case is insufficient, based on speculation, hearsay and is non-specific as to what statements and actions are attributable to each [respondent] and because petitioner failed to file her Bill of Particulars, the court can only assume that [Amen] filed the pleading without proper facts and evidence to support her claims."

¶ 9    On June 9, 2021, Amen voluntarily non-suited the three petitions. Respondents subsequently filed their own respective motions for sanctions, attorney's fees, and costs pursuant to Rule 137. Attiah alleged that Amen was on the Woodland School District 50 board and running for re-election in April 2001. Amen was reelected to the board during the pendency of her petitions. As to the claims in Amen's petition, Attiah's attorney, Laura Horner, asserted as follows:

"8. The statements attested to in the petition filed by the Petitioner, an attorney herself, are speculative, unsubstantiated, untrue and/or so vague a claim cannot be substantiated.

9. The claims in the petition are generalizations of conversations either in person or on a public Facebook group. Had the allegations been true of written posts, the best evidence would have been the post itself. No copies or screenshots of the Facebook messages were attached to the petition or offered into evidence. Not even the alleged Facebook "post [that] was taken from my personal private page" was offered, even though [Amen] has access and control of that page.

10. Petitioner's claim that [Attiah] took a post from a private page is not grounded in fact. In actuality, the post was taken from a public post found on Petitioners individual Facebook page, not a private post. Petitioner, an attorney licensed in the state of Illinois, attested and verified allegations which were untrue in an attempt to make the court believe that [Attiah] hacked into a private post on a private Facebook page.

11. [Attiah], in her capacity as a concerned citizen, sent a letter to the Woodland School District 50 to complain about Petitioner's actions and behaviors as school board member.

12. As an elected official, Petitioner is subject to scrutiny and criticism in public forums as a product of debate and the democratic process.

13. Petitioner has no personal knowledge of the allegations made in her petition as exemplified in her language of, "I was contacted," "Respondent allegedly," and "Either she is making the threats herself or she is culpable."

14. Petitioner makes broad, non-specific statements without proof of the statements, and the statement are not grounded in fact. Examples include: "uncivil," "They have written letters to my office under false names," and " went onto their page and other pages making statements about me...."

*** 

16. As an attorney, and as being represented by an attorney, the Petitioner and the attorney of record have a responsibility to file a pleading based on evidence and facts known to the Petitioner that are not hearsay or inadmissible conjecture. In addition, the Petitioner and her counsel have a responsibility to know that Illinois is a fact pleading state and specific facts were to be plead.

17. As a result of the above failure to plead specific facts, to plead only facts known to the Petitioner that are not hearsay and failure to plead facts which are true and correct, the Petitioner and her counsel have filed this petition for an improper purpose and to harass [Attiah]."

Rand and Green, both represented by Jason Mercure, each asserted that Amen's petitions were

frivolous. Rand's motion made the following relevant assertions:

"8. [Amen] alleges that statements or posts were made on her private Facebook page, which was not private at the time and continues to not be a private page.

9. [Amen's] claim that [Rand] took a post from a private page is not grounded in fact. A post was taken from a public post found on [Amen's] individual Facebook page, not a private post. [Amen], a licensed attorney in the state of Illinois, attested and verified to the allegations which were untrue in an attempt to make the Court believe that [Rand] hacked into a private post on a private Facebook page.

\*\*\*

11. [Amen] in fact knew and knows that [Rand] was not a part to any recording against [Amen] and states so in a post to [Rand], stating in part: "And while I know that you did not make that recording."

12. In a separate post, [Amen] stated in part: "I would hate to have harm done to my reputation based on words that are untrue." The irony of this statement is that she apparently has no regard for her false allegations having any potential harm done to [Rand's] reputation.

13. The Petition that was filed against [Rand] is frivolous, without merit, contains unsubstantiated or false statements and is inappropriate."

¶ 10    On July 29, 2021, Judge Matthews recused from any further proceedings in the matters due to the potential appearance of impropriety stemming from a May 27, 2021, text and phone conversation between him and Amen. The matters were assigned to Judge Simonian.

¶ 11    On September 22, 2021, the trial court held a hearing on respondents' motions for sanctions.[1] Before proceeding on the motions, the trial court conducted the following exchange:

"THE COURT: *** Next, we have got the hearing for the three motions for sanctions filed by the three Respondents. And I know there's some different pleadings regarding each. However, due to the significant similarity, I am very happy to hear all of this at once. Boy, do I highly recommend it. I think we kind of got into that a little bit last time which all the parties agreed even though the Court understands that not every fact is relevant to each Respondent but, boy, there's such similarity that it would be in everyone's best interest *** for us to do that.

***

BURTON: I apologize. May I ask so just for procedural purposes so I can follow along properly will it be Ms. Horner calls a witness, and then I cross then Mr. Mercure calls a witness and I cross and then he calls another witness on his other case then I cross? Are we doing it that way?

THE COURT: And the only reason, pretty much but here is just one thought I have. And that is if possible that, for example, Ms. Horner does direct on Ms. Attiah it is possible Mr. Mercure is saying, boy, I think there's something related to Ms. Green or Ms. Rand that's relevant here and I should be asking a question of Ms. Attiah. And I do believe that is potentially appropriate because if not he might end up asking one of the other Co-Respondents in his case and, boy, I don't want them coming back for questioning. So in

---

[1] The entirety of the hearing took place across multiple dates: September 22, 2021, October 4, 2021, October 21, 2021, and October 27, 2021.

other words, I would ask the Co-Respondent for lack of a better phrase to ask questions. And then you may cross all at once, Ms. Burton. And, boy, if I screw up that order later on please remind me.

BURTON: The only issue I would have, Your Honor, is that Ms. Green and Ms. Rand are potentially witnesses. So I would make a motion first to have all witnesses not in the courtroom or in the zoom platform. Because if they hear something Ms. Attiah says and now in a sort of way Mr. Mercure will be acting as Co-Counsel because I am assuming you are allowing him to direct questions from Ms. Attiah. And then if he gets to talk with his clients, Ms. Green and Ms. Rand, they have heard the answer particularly of a witness or Co-Defendant. I don't know how we are doing that. That's my only concern about him then being also able to question Ms. Attiah unless that's under cross. Otherwise, he would be like Co-Counsel if he is directing her as well.

THE COURT: Well, but it would be a couple things. One, I am not excluding litigants from being present.

BURTON: Okay.

THE COURT: And even though I am not excluding litigants from being present, they have the absolute right to be here. That's all there is to it. Now, to your second point was when Mr. Mercure talks is he doing direct or cross. Boy, I would think it would be more than official, for lack of a better phrase, the Petitioner if has to do it under direct and not cross. Because you would have a better argument later on that, he, he can't, why should he be able to cross, who is more likely not an adverse witness even though not a direct, even though not his own person. You know what I mean.

BURTON: Oh, yes. I understand that. I, just because I guess we are probably acting as if the cases are consolidated. I am trying in my mind so I can make sure procedurally so I can keep everyone different and be able to separate it. So if I guess I put in my mind that this is as if it's a consolidated case then there would be all the litigants. Otherwise, they wouldn't be litigants to Ms. Attiah's case because hers is separate from Ms. Rand and Ms. Green. But if the Court is consolidating all the cases then I understand it. I know how to move appropriately.

THE COURT: I don't know if you want to consider it consolidated or not. But they're so similar with differences that this Court wants it to be heard as to all parties. But I am going to allow them to be in. I don't shut the Court off to litigants.

BURTON: Okay.

\*\*\*

[THE COURT]: So the bottom line is I think this is more efficient. And certainly you are welcome but you are going to get the final say on cross \*\*\*. Anything else before we start, folks?

MS. BURTON: No, Judge. Not from us."

¶ 12    Social media posts were entered into evidence that elucidated the events leading to the filing of Amen's petitions. On March 12, 2021, Amen posted the following message about her law office to her public Facebook page:

"If you rented that car for the weekend and put that brick of heroin in the trunk and the cops pulled you over, no worries, call me when you get to the county \*\*\*. I got you. The ladies of Bur-Men work on the weekend. Cause K-9 Dax is for sure working, so are we. It's too nice to be in jail!!!."

Green re-posted the Amen's message to the Woodlands District 50 for In-Person Learning Facebook group with her own advice: "Research your candidates before your vote." Attiah responded with "Wow! That's a nice business plug." Rand responded that "there's a lot more on her page." Attiah replied to Rand's post that "[i]t's honestly like a train wreck." Rand posted a reply to Attiah with a meme from a television program that read "It's Funny because it's true."

¶ 13   After being informed about the comments on the public Woodlands District 50 for In-Person Learning Facebook page, Amen posted the following message on March 27, 2021, to her campaign page:

"Now we know who is behind the targeted attacks!!! I need everyone who is a registered voter in my district who knows me and my character to come out and vote! There is a select group, who have hidden behind a private Facebook group called Woodland D-50 for in person learning that have been behind the racial and vile attacks [on] me! Let's stand up and show them we will not tolerate this. Apparently they are going onto my private page to make a case for why I am not a good candidate because I am a criminal defense attorney and represent [']bad people.[']

Shari Green, Deb Attiah, Heather Rand, I am perplexed at why you all in particular seem to be so obsessed with me. I wonder if your Gurnee neighbors know that you all are behind a targeted racial campaign against me, so much so that the district has had to denounce your racist comments and statements against me. Going onto my private Facebook page and posting screenshots onto a private group is your business if you have nothing better to do, if that's your research. I am a criminal defense attorney, I fight for people who are accused of heinous actions in our community, but I also fight for the children and teachers in our district. I don't hide who I am. But you all hide behind secret

Facebook groups to hide the racial hate that you all continue to spew in this community. If you and your friends don't think I'm a worthy candidate, that's your choice[.] This is a democratic process, but to come after my family, my business and use race is disgusting and vile. That should not be what Gurnee is about. Don't hide behind a closed group or fake accounts. I will not be run off."

Amen posted the same message to the Gurnee Town Square Facebook page.

¶ 14    Green contacted school board president Carla Little and asked to contact Amen in order to put an end to the public vitriol espoused by Amen. Little provided Amen's contact number and on March 27, 2021, Green texted to Amen the following message:

"This is Shari Green. I received your [number] from Carla. I reached out to her first as a member of my church. I can't imagine what life has been like for you and your family with racially targeted threats and hate. I won't pretend to understand. Although it is true that I don't agree with some things you have said and posted, I have never disagreed because of race or said a derogatory thing because of race. I'm respectfully asking my name be removed from anything accusing me of racially targeted threats. I absolutely condemn this type of behavior and would never support it or contribute to it."

Amen responded to Green's message with "Please do not contact me."

¶ 15    On March 28, 2021, Attiah sent an e-mail to the Woodland District 50 School Board members to demand action against Amen's public comments towards respondents. Her e-mail read as follows:

"I am writing to you today with a very serious complaint about one of your Board members, Renea Amen. I have not copied her here because of the severity of accusations she has made against me, without any standing, and two others in our community.

While I can't speak to the other two member of the Woodland D50 for In-Person Schooling Facebook Page, I will stand up for myself and defend myself and my family from the slanderous and vile statements that [Amen] is posting publicly as a Representative of our School Board and our Community. She has singled me out, with 2 others, and made false accusations of racial slurs and threats toward her, which are not warranted. If there is any evidence of such threats, it should be produced immediately to substantiate her claims. There is absolutely no evidence to tie me to any such threats or racial comments.

The only comments I have made were in response to other Facebook posts that are strictly related to her behavior during the public School Board Meetings, her inappropriate use of the F word during one such meeting while children were attending with their parents, how she came to be on the School Board, and another post that shared business statement by [Amen] which included drug references and single out Police Dog K9 Dax (which seemed very inappropriate to many). I have not attacked her, I have NEVER been in direct contact with her except today via Facebook to defend my name when she slandered me on her personal page, her Renea Amen for Woodland District 50 page, and also the Gurnee Town Square Page. Thankfully, the Admin took down her post on the Gurnee Town Square page last night after reviewing it ***. I have never made any racial comments, ever, toward her or anyone else as she is falsely claiming.

As an attorney, [Amen] should understand the severity of her reckless accusations, the severity of slanderous statements she had made, and the consequences of character defamation. She should be held to the highest standards, following legal protocols. She cannot simply play games on Social Media, calling people out recklessly. This reflects poorly on our Board, and the Community as a whole. I have children in the District and

they should NOT be subject to smears like this either. And now other friends of [Amen] are also forwarding and posting her unfounded claims.

I expect a written apology, both from [Amen] and the Board, within one week for her direct attacks (Sunday, April 4, 2021). If this does not happen, I will consider legal action, against her and the School Board."

Attiah sent an email to the school superintendent later that day asking the District to apply its policy condemning hate language and harassment equally to School Board members. Amen filed the petitions against respondents the following day, March 29, 2021.

¶ 16    Respondents each gave their own respective testimony as to the posts on Facebook such as how "tagging" works and privacy settings regarding the visibility of certain posts. Amen's counsel objected, asserting that such testimony "calls for an expert opinion as to how Facebook works, at least someone from Facebook." In overruling the objection, the trial court noted

"Someone who uses [Facebook] may know that stuff, and someone who barely uses it is happy to have some education on it. And, boy, you are welcome to cross examine if she said something wrong. But it's overruled."

¶ 17    Amen testified as an adverse witness that she learned of a parent group opposed to virtual classrooms and the school board's refusal to return students to in-person learning in Woodland District 50. She testified that she and "two male whites" voted to keep schools closed to in-person learning. Amen stated that she received a letter addressed to her at her law office before special school board meeting on reinstatement of in-person classes. Amen testified that she does not open mail at her law office, so a person from her staff read the letter and told her "they're mad at you." Amen was never read the contents of the letter, nor did she read the letter herself. She did not know who sent the letter and was unaware of any "troubling language."

¶ 18    Amen alleged that on an evening in February 2021, one of her children heard a noise in their backyard. She recalled seeing footprints in the snow. She could not connect the noise and footprints to any of the respondents.

¶ 19    Amen admitted that she was unaware of the privacy setting to her personal Facebook page or her campaign page, although she repeatedly referred to her personal page as "private." She admitted that Green never personally contacted her at her home, office, email, phone, or any other manner aside from the text message sent on March 27, 2021. She claimed that there was a "recorded conversation" stating that when "these people get a little bit of money they think they can make decision for us. Why can't she just stay in Waukegan, isn't that the trash she represents?" However, Amen admitted that she never heard this "recorded conversation" and did not know who said it, except that someone named Dawn Martin told her it was Attiah. She could not confirm the "recorded conversation" even existed.

¶ 20    As to her claim that an anonymous message to her Facebook account stated that Amen and her children were privileged, and that the sender knows where Amen lives, she could not provide proof or a screenshot of this alleged message. Further, she could not link the alleged message to respondents in any way. She testified that the message came from a "fake account." Due to her concerns related to the alleged threats, Amen testified that she had to hire personal security. This consisted of increasing her ADT home security.

¶ 21    Amen stated that she did not preserve any of the evidence related to the alleged threatening material because she was unconcerned at the time. She admitted that she was unaware of any calls to her office or personal phone from any of the respondents. She only could recall receiving communication from other names with the same viewpoints as the three respondents.

¶ 22    Respondents rested their cases and Amen's counsel moved for a directed finding. Following arguments from the parties, the trial court denied the motion as to each respondent.

¶ 23    Amen testified as a witness in her own case that she perceived the message that she "should go back to Waukegan" as "microaggressive racism," because "racism is subjective to me. It doesn't have to be what someone else thinks. It's what I think. And even though it might not be somebody saying nigger, it's basically saying, go back to Waukegan, *** go back to your kind."

¶ 24    Amen claimed to have no political motive against the respondents for their comments against her reelection or their opposition to her stance on in-person learning. As to the timing of her petitions, eight days before the election, Amen testified that she did not know the date of the election. She stated that she was in Hawaii when the election took place but was not sure how long she spent there.

¶ 25    On November 26, 2021, the trial court issued a 21-page memorandum order granting respondents' motions for Rule 137 sanctions and finding Amen responsible for the reasonable attorney's fees and costs incurred due to her three petitions. Respondents' testimony was deemed credible while the trial court did not find Amen's testimony credible. The trial court went on to make the following findings:

> "These respondents were not doing anything threatening or harassing. They were doing the most encouraged of American activities: getting involved in their communities. They were talking with neighbors about the best things for their school system. Some communication was serious, others farcical. Not one bit of it was threatening or harassing. Petitioner's reference to them as racists with zero evidence was obviously more out of bounds as harassing than anything respondents did, though petitioner's conduct in that part of this analysis is not the issue.

This is not a situation where there is no harm from petitioner asking for a motion to be granted. While not dispositive of the outcome, Petitioner used her status as a public official to intimidate ordinary citizens. Worse, this petition was filed one day after a respondent demanded the school board act against Petitioner for her public campaign against them. It's obvious to the Court that Petitioner wished to show them the consequences of public disagreement with her and quash their campaign and criticism of her. Oddly, these respondents had little to no contact with Petitioner. Can you imagine if a local mayor sought court action against a constituent or constituents for little more than online campaigning against that mayor? There's essentially no difference between that scenario and this. Someone who dares to fight City Hall should be able to do so without fear of meritless litigation. It's not lost on the court that Petitioner labels herself as a criminal defense attorney and civil rights attorney while seeking this claim against ordinary citizens, though her status as an attorney is not essential to the court's finding.

It is easy to fear a possible misinterpretation to any result here. Either the Court protects a candidate for office or one's right to expression without fear of retaliation. Once Petitioner sought court intervention, Petitioner ensured one of those would lose. But since Petitioner had no reasonable basis for fear of any of these three respondents, that choice is made easier."

The trial court found that Amen "filed each petition without reasonable inquiry into its basis, that it was not well-grounded in fact and law, and *** done so for the improper purpose of harassment of political enemies and for political gain." The trial court detailed false and/or misleading statements in Amen's petitions as including, but not limited to, the following:

"1. my personal private page.

2. that she does not have access to

3. There was a recorded conversation of the respondent allegedly that wished harm upon me

4. They have written letters to my office under false names

5. I asked her (Attiah) to stay away. She then emailed the Board in an effort to make contact with me.

6. (Respondent Rand) has been going onto my private page, is making threats herself…

7. (Respondent Green) got my phone number and called me even though I requested no contact."

The trial court concluded that "the untrue statements coupled with the misleading statements result in a false narrative that is not objectively reasonable to believe."

¶ 26    On December 16, 2021, Amen filed a motion to reconsider. The trial court held a hearing on the arguments raised therein before issuing an order denying the motion on January 21, 2022. The trial court issued a separate order on January 21, 2022, assessing fees and costs against Amen in favor of respondents.

¶ 27    Amen then timely filed the instant appeal.

¶ 28                                    II. ANALYSIS

¶ 29    Of the numerous contentions raised by Amen in this appeal, only one is not directed at all respondents. We will begin our analysis with the contentions raised against respondents collectively, before addressing her pleadings issue against Rand.

¶ 30    Amen contends that the trial court erred by holding a single hearing on respondents' motions for sanction without consolidating the matters. The exchange detailed above (*supra* ¶ 11)

between the trial court and Burton reveals that Amen failed to raise an objection to the consolidation of the motions.

¶ 31 Additionally, Amen contends that the trial court erred by failing to exclude each respondent from the hearing during the respective cases-in-chief when not acting as a witness. This contention is particularly baffling to this court. The only mention of excluding witnesses, aside from the exchange between the trial court and Burton detailed above (*supra* ¶ 11), occurred before the hearing when the trial court admonished the parties in the following manner:

"BURTON: Your honor, we will make a motion to exclude witnesses. I believe your admonishment does that but just formally for the record.

THE COURT: Okay. Motion to exclude is granted and I'm confident it's reciprocal. I want to make sure everybody knows that. What the motion to exclude means against the litigants is that if somebody, we don't want anybody listening to somebody else's testimony. Okay. Respondent B may have a different witness who's not here. You know my neighbor heard this or something like that. I don't want that neighbor to be listening. Okay. You can't listen to anything or be here *** if you're going to be a witness. You are always welcome *** to listen if you are not going to be a witness. But the witnesses who would be here normally would be waiting in the hallway. Anything else before we start?

BURTON: No, Judge."

Our search of the record fails to reveal Amen registering an objection to the trial court's decision on witness exclusion. Variations of the term "object" appear 306 times in the report of proceedings presented to this court. None of those appearances is related to Amen objecting to the trial court's decision of exclusion of witnesses. Only understanding and acquiescence appear in response to the trial court's explanations.

¶ 32    When a party fails to raise a claim before the trial court, that party forfeits consideration of the issue on appeal. *In re Marriage of Gabriel and Shamoun*, 2020 IL App (1st) 182710, ¶ 72. The rationale for finding the claim forfeited is to " 'ensur[e] both that the trial court is given an opportunity to correct any errors prior to appeal and that a party does not obtain a reversal through his or her own inaction.' " *Id.* (quoting *1010 Lake Shore Association v. Deutsche Bank National Trust Co.*, 2015 IL 118372, ¶ 14). As the record is devoid of Amen's objections regarding the issues raised in these two contentions, any contentions of error are forfeited.

¶ 33    Amen next contends that the trial court erred in denying her motion for a directed finding after respondents had rested their cases-in-chief. This contention ignores the plain language of section 2-1110 of the Code of Civil Procedure (the Code). 735 ILCS 5/2-1110 (West 2020). Section 2-1110 states as follows:

> "Motion in non-jury case to find for defendant at close of plaintiff's evidence. In all cases tried without a jury, defendant may, at the close of plaintiff's case, move for a finding or judgment in his or her favor. In ruling on the motion the court shall weigh the evidence, considering the credibility of the witnesses and the weight and quality of the evidence. If the ruling on the motion is favorable to the defendant, a judgment dismissing the action shall be entered. If the ruling on the motion is adverse to the defendant, the defendant may proceed to adduce evidence in support of his or her defense, in which event the motion is waived." *Id.*

Following the denial of her motion for a directed finding, Amen presented evidence in her own defense. "A defendant who presents evidence on its behalf after its motion is denied waives any complaint that the denial of the motion was in error." *Evans & Associates, Inc. v. Dyer*, 246 Ill. App. 3d 231, 239 (1993). As such, Amen's contention of error on this issue is waived.

¶ 34 Next, Amen contends that the trial court erred by allowing respondents to admit evidence that was not introduced by their respective attorney. The evidence Amen complains of consisted of text messages and email communications related to the allegations in her original petitions against respondents. She argues that the evidence was admitted improperly under Illinois Rule of Evidence 105.

¶ 35 The admission of evidence is within the sound discretion of a trial court, and a reviewing court will not reverse the trial court absent a showing of an abuse of that discretion. *People v. Becker*, 239 Ill. 2d 215, 234 (2010). An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would agree with the position adopted by the trial court. *Becker*, 239 Ill. 2d 215, 234.

¶ 36 Rule 105 states as follows:

"When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper purpose or scope and instruct the jury accordingly." Ill. R. Evid. 105 (eff. Jan. 1, 2011).

Amen admits that the underlying proceedings were not tried in front of a jury, but nonetheless maintains that the admission of the evidence violated her right to due process and a fair trial. We disagree.

¶ 37 Rule 105 is inapplicable here. The text messages and email communications were admissible as to all respondents. "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Ill. R. Evid 401 (eff. Jan. 1, 2011). All relevant evidence is admissible, except as otherwise provided by law. Ill. R. Evid 402 (eff. Jan.

1, 2011). Amen's petitions made virtually duplicative accusations against all three respondents. It would strain credulity to agree that the evidence was admissible against one of the respondents while inadmissible against another. Moreover, a trial court is presumed to know the law, and we will ordinarily presume that it followed the law unless the record shows otherwise. *People v. Groel*, 2012 IL App (2d) 090595, ¶ 43 (citing *People v. Gaultney*, 174 Ill. 2d 410, 420 (1996)). Nothing in the record suggests that the trial court's admission of any evidence was in any way an abuse of discretion.

¶ 38    Amen next contends that the trial court erred in allowing respondents to testify as expert witnesses when they testified to "certain technical aspects of Facebook" such as "privacy settings, public versus private pages, locking pages" and "whether certain information looks tagged." Amen argues that respondents' testimony required qualification as an expert because it was based on "scientific, technical, or other specialized knowledge." See Ill. R. Evid. 701 (eff. Jan. 1, 2011).

¶ 39    In deciding whether to admit expert opinion testimony, the trial court must consider whether the testimony would aid the trier of fact in understanding the facts. *Towsend v. Fassbinder*, 372. Ill. App. 3d 890, 905 (2007). In general, the factors a trial court will consider include the complexity of the subject involved, the purpose for which the opinion is offered, its relation to the ultimate issue to be determined, and the danger of undue prejudice. *Id.* The decision to allow an expert to testify on matters of opinion lies within the discretion of the trial court. *Id.* We will not reverse an erroneous ruling unless the error was prejudicial or the result of the trial was materially affected. *Id.*

¶ 40    None of the respondents testified as experts during trial. There was no testimony to anything outside of the knowledge possessed by any normal user of the platform. Indeed, the trial

court addressed Amen's objection to allowing Green to testify to her knowledge of Facebook use in the following exchange:

"THE COURT: *** There's millions of Americans that can testify to what she's talking about. I am not one of the millions, by the way. There's millions who could. And the objection is overruled. She's not talking about algorithms. She's not talking about stuff that only a few dozen or whatever folks know about. She's testifying to what all too many folks in this world know."

This explanation is applicable to the testimony of all respondents. They testified based upon their experience using Facebook, not a complex subject. Further, respondents' testimony, while an aid to the trial court's ignorance about Facebook use, was not central to the ultimate issue of whether Amen's petitions were filed for an improper use and subject to sanctions. Finally, Amen fails to argue to this court how such testimony, even if improper lay testimony, was prejudicial or materially affected the outcome of the case. We can find no abuse of discretion in the trial court's allowance of respondents' testimony.

¶ 41     Amen next contends that the trial court erred in overruling certain objections her counsel made to "leading questions" by respondents' counsel, while forbidding Amen's counsel from asking leading questions of her during cross-examination. She cites individual instances in each respondent's case where her counsel objected to what she deemed a "leading question," only to have the trial court overrule the objection as foundational. Amen then cites a single instance when her counsel was told by the trial court not to ask leading questions during cross-examination.

¶ 42     The propriety of permitting leading questions is a matter committed to the sound discretion of the trial court whose decision will not be reversed unless there has been a manifest abuse of discretion. *Matter of Ketter's Estate*, 63 Ill. App. 3d 796, 802 (1978).

¶ 43  Our review of the record reveals that all parties were afforded a full and fair hearing. The record is replete with objections related to leading questions by attorneys for all parties. Nothing in the record suggests that the trial court's rulings on those objections had an adverse impact on the fairness of the trial, let alone constituted a manifest abuse of discretion. Amen's counsel had the ability to cross-examine all respondents. The trial court informed Amen's counsel before trial that she would be afforded "the final say on cross." Amen's counsel did indeed have "the final say on cross" and utilized it with each respondent. Her argument on this issue invites this court to find prejudicial, reversible error by reducing a full and fair trial to a couple cherry-picked adverse rulings. We decline to do so and find no abuse of discretion in the trial court's rulings.

¶ 44  Amen's last contention directed at the collective respondents is that the trial court erred in granting their motions for sanctions pursuant to Rule 137. She argues, *inter alia*, that the trial court improperly ruled on respondents' motions "as if it were a plenary hearing", relied on unverified exhibits, and allowed irrelevant testimony and facts. The record does not support Amen's contention.

¶ 45  Rule 137(a) states as follows:

"Every pleading, motion and other document of a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address shall be stated. A party who is not represented by an attorney shall sign his pleading, motion, or other document and state his address. Except when otherwise specifically provided by rule or statute, pleadings need not be verified or accompanied by affidavit. The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion or other document; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by

existing law or a good-faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. If a pleading, motion, or other document is not signed, it shall be stricken unless it is signed promptly after the omission is called to the attention of the pleader or movant. If a pleading, motion, or other document is signed in violation of this rule, the court, upon motion or upon its own initiative, may impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of reasonable expenses incurred because of the filing of the pleading, motion or other document, including a reasonable attorney fee." IL. S. Ct. R. 137(a) (eff. Jan. 1, 2018).

¶ 46    The determination of whether to impose sanctions rests within the sound discretion of the trial court, and that decision will not be disturbed on review absent an abuse of discretion. *Garlick v. Bloomingdale Township*, 2018 IL App (2d) 171013, ¶ 25. An abuse of discretion occurs when no reasonable person could have shared the view taken by the trial court. *Id*.

¶ 47    Rule 137 is intended to prevent the filing of false and frivolous lawsuits. *Stiffle v. Baker Epstein Marz*, 2016 IL App (1st) 150180, ¶ 32. The rule is designed to prohibit the abuse of the judicial process by claimants who make vexatious and harassing claims based upon unsupported allegations of fact or law but not to penalize attorneys or litigants who were zealous but unsuccessful. *Id*. The party seeking sanctions for a violation of Rule 137 bears the burden of proof and must show that the opposing party made untrue and false allegations without reasonable cause. *Id*. Since Rule 137 is penal in nature, it must be strictly construed. *Id*.

¶ 48 The record supports the trial court's findings for Rule 137 sanctions against Amen due to the untrue allegations littered throughout her petitions. See *supra* ¶ 25. The evidence also fully supports the notion that sanctions were appropriate as the allegations in Amen's petitions were wholly unsupported by facts or law. Indeed, the evidence tended to show that the petitions were designed to stifle respondents rights to speak out against Amen's effort to gain re-election to the school board. The trial court explicitly found as such by noting

"This is not a situation where there is no harm from petitioner asking for a motion to be granted. While not dispositive of the outcome, Petitioner used her status as a public official to intimidate ordinary citizens. Worse, this petition was filed one day after a respondent demanded the school board act against Petitioner for her public campaign against them. It's obvious to the Court that Petitioner wished to show them the consequences of public disagreement with her and quash their campaign and criticism of her. Oddly, these respondents had little to no contact with Petitioner. Can you imagine if a local mayor sought court action against a constituent or constituents for little more than online campaigning against that mayor? There's essentially no difference between that scenario and this. Someone who dares to fight City Hall should be able to do so without fear of meritless litigation. It's not lost on the court that Petitioner labels herself as a criminal defense attorney and civil rights attorney while seeking this claim against ordinary citizens, though her status as an attorney is not essential to the court's finding."

Amen takes further issue with the last sentence in the above findings. She asserts that the trial court improperly relied on her status as an attorney in granting respondents' motions for sanctions. This assertion is meritless. Rule 137 applies to both attorneys and litigants. See IL. S. Ct. R. 137(a) (eff. Jan. 1, 2018). Throughout the proceedings Amen referred to herself as an attorney. She took issue

in her petitions with respondents' comments on her advertisement for services as an attorney. At no point in the underlying proceedings did she object or otherwise complain about being labeled as such. The trial court's reference to her status as a criminal defense attorney in no way indicates that it relied on that status in granting the motions for sanctions. As Rule 137 applies equally to both attorneys and litigants, her complaints on this issue are a non-event.

¶ 49    Equally meritless is Amen's assertion that the trial court treated the hearing on respondents' motions for sanctions as a plenary hearing for an order of protection. The argument is based on the trial court's reference to the hearing as an "OP" near the end of the hearing on September 22, 2021. Burton then corrected the trial court by noting that it was a motion for sanctions brought by respondents' counsel. The court then tells Burton, "You are right." At the beginning of that hearing, the trial court referred to the matter as "a Motion for Sanctions and movant in this case is respondent." The order awarding sanctions to respondents repeatedly refers to the motions for Rule 137 sanctions. To state it mildly, Amen's assertion that the trial was treated as a plenary hearing for an order of protection is based on a momentary misstatement by the trial court as opposed to any theory grounded in Illinois law or a reasonable person's ability to read the report of proceedings.

¶ 50    In sum, the trial court's award of sanctions and fees in favor of respondents was not an abuse of discretion. The detailed order is supported by the evidence presented and we will not disturb those findings here.

¶ 51    Finally, we must address Amen's contention that Rand's attorney fees were improperly considered by the trial court. She argues that because Rand's prior attorney, Alan Lecysnski, in the underlying proceedings did not produce his own sworn statement as to the fees incurred, those fees should be disregarded. We disagree.

¶ 52    Rand's attorneys fees were documented in what was admitted as respondent's Exhibit 6. Rand authenticated the document with the following testimony:

> "[MERCURE]: Is this respondent's Exhibit 6 a fair and accurate portrayal of what that statement looked like?
>
> [RAND]: Yes.
>
> [MERCURE]: From Mr. Lecysnski's firm?
>
> [RAND]: Yes.
>
> [MERCURE]: And, did you, in fact, pay money to his firm?
>
> [RAND]: Yes."

To lay a proper foundation for a document, a party must present evidence that shows that the document is what it purports to be. *Cordeck Sales, Inc. v. Construction Systems Inc.*, 382 Ill. App. 3d 334, 378 (2008). The party can authenticate the document by providing an affidavit or by presenting testimony of a witness who has sufficient personal knowledge of the document. *Id*. Rand's testimony was sufficient to authenticate the document. It was properly admitted into evidence and Amen's arguments to the contrary are without merit.

¶ 33                              III.CONCLUSION

¶ 34    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 35    Affirmed.